# In the United States Court of Federal Claims

No. 06-635C
Filed: October 29, 2010

```
******************************************   *
                                            *
EDGE CONSTRUCTION COMPANY, INC.,            *
                                            *
                    Plaintiff,              *
                                            *
        v.                                  *
                                            *
THE UNITED STATES,                          *
                                            *
                    Defendant.              *
                                            *
******************************************   *
```

———————————————

## OPINION AND ORDER
———————————————

**DAMICH**, Judge

This government construction contract case is before the court on the Government's motion for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  Edge Construction Company ("Edge" or "the Plaintiff") alleges that the Government breached its contract by denying Edge's claims for additional costs and extensions of time and improperly terminated the contract for default.  The Government contends that the Contracting Officer properly denied Edge's claims and was justified in terminating the contract for default.

Edge seeks recovery on eight counts for the Government's breach of contract for refusing to issue change orders and denying its claims for:  (1) relocation of a well (Count I);  (2) additional catch basin and six-inch storm pipe (Count II)); (3) additional catch basins and ten-inch storm pipe (Count III); (4) pipe insulation (Count IV); (5) borrow pit (Count V); (6) unseasonable weather/acceleration (Count VI); (7) lost productivity due to unseasonable weather (Count VII); and (8) lost productivity resulting from rain, freezing conditions, and mud (Count VIII).

With regard to the Government's termination for default, Edge sets forth two additional counts:  (1) conversion of termination for default into termination for convenience (Count IX); and (2) wrongful termination damages including amounts expended by Edge's surety (Count X).

The Government's motion is granted in part and denied in part.  The Court denies summary judgment on Counts I, II, and IV because Edge established genuine issues of material fact as to the costs for the additional work.  The Court grants summary judgment for the Government on Counts III and V because the alleged additional work was within the scope of the contract.

With regard to Edge's claims for equitable adjustments for lost productivity due to "unseasonable weather," summary judgment is granted on these counts (Counts VII and VIII) because as a matter of law Edge is not entitled to equitable adjustments for lost productivity attributable to unusually severe weather conditions.  Summary judgment is denied on Count VI (project acceleration) because a genuine issue of material fact remains regarding the existence of "unseasonable weather," and the Government does not show that it is entitled to judgment as a matter of law.

Finally, the Court denies summary judgment on the Government's termination for default (Counts IX and X) because of a genuine issue as to the contract completion date, which is an essential fact in considering termination for default.

I.    BACKGROUND

On September 1, 2004, the Department of Veterans Affairs, National Cemetery Administration ("the Government"), awarded Contract No. V786C-108 8A ("the Contract") to Edge, for the construction of the Great Lakes National Cemetery in Michigan in the amount of $8,691,000.00.  Pl.'s Second Am. Compl. ¶¶ 4-5; Def.'s Mot. Summ. J. ("Def.'s Mot.") 3.  The Contract contained clauses from Federal Acquisition Regulations ("FAR") for "Disputes" (FAR 52.233-1), "Default" (FAR 52.249-10), and "Changes" (FAR 52.243-4).  Def.'s Mot. 3.

On September 20, 2004, Edge contracted with Ferguson Enterprise, Inc. ("FEI") as a subcontractor to perform work, including, but not limited to, "earthwork, utilities, site clearing, asphalt and striping."  Pl.'s Resp. in Opp'n Def.'s Mot. Summ. J. ("Pl.'s Resp.") 1; Erdman Aff. Ex. A.

In accordance with the Notice to Proceed (NTP) issued on September 21, 2004, the Government required Edge to complete the Early Turnover Area ("ETA") within 230 calendar days of the NTP (by May 16, 2005), and the overall contract within 620 days of the NTP (by June 14, 2006).  Def.'s Mot. 3; Pl.'s Resp. 1.

Between January 20, 2005 and March 16, 2005, the parties held five project meetings.  Def.'s Mot. 3-5.   In January and February, the Government requested schedules of project activities and values and expressed concerns regarding the level of manpower and equipment on site.  Id. at 3-4. On February 16, 2005, Edge cited poor weather conditions impacting its ability to perform many activities.  Id. at 4.  In response to the Government's request that Edge explain why it could not meet the contract ETA completion date, Edge explained, by letter dated March 11, 2005, that "November and December had been one of the worse winters in the past 20 years in [the] area."  Def.'s Mot. 5; Def.'s App. 42.  Edge explained that the rain, freezing conditions, and mud affected site conditions and the ability of its subcontractors to operate the equipment

2

under those conditions.  Def.'s App. 42-43.  Edge projected that it would complete the ETA by July 16, 2005, two months after the contractual timeframe.  *Id.* at 43.  Edge communicated the same at the project meeting held on March 16, 2005.  Def.'s Mot. 5.

The Government expressed its concerns that Edge would not complete the ETA by August 16, 2005, and that it believed that Edge contributed to its delay beyond simply incurring extreme weather conditions.  *Id.* 6.  Nonetheless, on April 19, 2005, the Government "granted Edge an additional 63 days to complete the ETA" to compensate for "weather-related delays that Edge experienced from September 21, 2004 until May 1, 2005.  The additional days were given at no cost to the Government."  *Id.* at 7; Def.'s App. 59-61.  The revised completion date for the ETA was set at July 18, 2005.  Def.'s Mot. 7; Def.'s App. 59-61.  The Government, via a change order of April 19, 2005, also indicated that the overall project completion date remained unchanged at June 14, 2006.  Def.'s App. 59-61.

On June 30, 2005, Edge submitted a request to the Contracting Officer to issue a change order for additional costs of $623,795.00 related to the extension of time for weather-related delays.  Def.'s App. 81-84; *see also* Def.'s Mot. 8 (noting that the "request for extension of time costs" was uncertified).

During the course of the project, in addition to weather-related conditions, Edge incurred additional work related to changes in the project plan directed by the Government for (1) the relocation of a well and (2) an additional catch basin and six-inch pipe.  Pl.'s Resp. 1.  The Government issued change orders and granted equity adjustments to Edge based on estimates of the Government's architect/engineer.  Def.'s Mot. 14, 17; Def.'s App 236-38; 162-63.  Edge also requested, although the Government refused to issue, additional change orders for these two items because the amounts the Government granted were less than the amounts Edge claimed it was entitled to for the work.  *See* Def.'s Mot. 14, 17.  In addition, Edge requested that the Contracting Officer issue change orders for (1) two additional catch basins and a ten-inch pipe; (2) the insulation of a pipe; and (3) borrow pit operations. Pl.'s Second Am. Compl. ¶¶ 20, 25, 30.  The Government denied Edge's request to issue these three change orders.  *Id.* at  ¶¶ 21, 26, 31.

Between May 13, 2005 and July 18, 2005, the Government issued over ten Deficient Omission Letters (DOLs).  Def.'s Mot. 7-9.  According to the Government, the deficiencies included "cracks and gouges in the crypts, lack of concrete footers, installation of foundation walls below the required elevation, improper bedding, unacceptable repair work for footer walls, incorrect curbing, among other things."  Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ J. ("Def.'s Reply") 17.  On July 27, 2005, the Government issued a "Show Cause Notice" to Edge:

> You are notified that the Government considers that your lack of progress as indicated above is a condition that is endangering performance of the contract. The Government … is considering what action is in the best interest of the Government, including considering terminating the contract for default in accordance with FAR 52.249-10 Default (Fixed-Price Construction)(Apr 1984). Pending a final decision in this matter, it will be necessary to determine whether

your failure to perform arose from causes beyond your control and without fault
or negligence on your part.

Def.'s App. 93-94.

On August 8, 2005, Edge responded via fax to the Government's Show Cause Notice and
indicated the status of DOLs and that it expected to complete the ETA by August 24, 2005.
Def.'s App. 96-99.  As of August 11, 2005, according to the Government, at least half of the
DOLs remained unresolved.  Def.'s Mot. 10.  The Government issued additional DOLs on
August 18, 2005.  *Id.* at 10-11.

On September 9, 2005, in light of "the repeated deficiencies in quality of work, schedule
slippages, poor coordination for the work in the ETA, and poor quality of the minimal amount of
work performed in the area outside the ETA," the Government "terminated the contract for
default, with the exception of the completed ETA work."  Def.'s Mot. 11 (quoting Def.'s App.
111).  The Government indicated that these problems were "endangering performance" and gave
the Government "'no confidence that Edge would complete the remainder of the Contract in
accordance with the specifications and by the established completion date.'"  *Id.*

According to the Government, by September 15, 2005, Edge substantially completed the
ETA work.  Def.'s Mot. 11 n.2.

Edge responded to the Government's notice of termination for default by letter dated
September 23, 2005.  *Id.* at 11; Def.'s App. 122-35.  Edge contested many of the Government's
assertions in its notice for termination (e.g., "concerted efforts on the part of the VA to assist
Edge," the number of open Deficiency Omission List (DOL) items) and raised issues as to the
performance of the Government that hindered Edge's ability to perform (e.g., design defects,
communications issues).  *See generally* Def.'s App. 122-35.

Edge filed its initial complaint with this court in September 2006.  In February 2008, the
Government filed a motion to dismiss for lack of subject matter jurisdiction on the grounds that
Edge had not filed and certified its claims with the Contracting Officer pursuant to 41 U.S.C. §
605(c)(1).  The Government subsequently withdrew its motion to dismiss to allow Edge to file
those claims administratively.  In May 2008, Edge filed an amended complaint, narrowing its
action to that of seeking to convert the Government's termination for default to a termination for
convenience instead.

In September 2008, Edge submitted nine claims to the Contracting Officer, seeking
equitable adjustments for eight claims for breach of contract and damages for one claim for
improper termination for default.  *See* Def.'s App. 137-39 (undated), 142-50, 155-61, 164-71,
180-87, 188-92, 208-223.  On December 12, 2008, the Contracting Officer denied all of Edge's
claims.  Def.'s App. 230-34.

Edge filed a second amended complaint in February 2009, asserting eight claims of
breach of contract and one claim for wrongful termination as well as seeking conversion of the

termination for default to termination for convenience.  The Government filed its instant motion for summary judgment on January 29, 2010, and briefing concluded on July 20, 2010.

Edge alleges that the Government's actions constitute breach of contract and wrongful termination.  Edge seeks recovery for the Government's breach of contract for refusing to issue change orders and denying its claims on the following 8 counts: (1) Count I -  well relocation ($98,252.35); (2) Count II -  additional catch basin and six-inch storm pipe ($22,386.28); (3) Count III – additional catch basins and ten-inch storm pipe ($16,289.90); (4) Count IV – pipe insulation ($27,879.18); (5) Count V – borrow pit ($446,494.30); (6) Count VI -  unseasonable weather/acceleration ($424,508.20); (7) Count VII - lost productivity due to unseasonable weather ($242,098.45); and (8) Count VIII - lost productivity resulting from rain, freezing conditions and mud ($329,467.60).  Pl.'s Second Am. Compl. ¶¶ 11, 16, 21, 26, 31, 36, 41, 46.  Edge also seeks recovery for wrongful termination: (1) Count IX – conversion of termination for default into termination for convenience and (2) Count X – wrongful termination damages including amounts expended by Edge's surety ($6,938,286.00).  *Id.* at ¶¶ 57, 59.

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it "might affect the outcome of the suit;" a dispute is genuine if the evidence is such that a reasonable trier of fact could find for the nonmoving party.  *Id.* at 248.  The party moving for summary judgment may prevail by demonstrating the absence of any genuine issues of material fact or by showing the absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 322-23.  If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact.  *Id.* at 324.  Any inferences that may be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Similarly, "[i]n cases in which there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant."  *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984).

## III.   DISCUSSION

The Court will analyze the Government's motion for summary judgment in the context of the counts in Edge's second amended complaint.  The Court will first discuss Edge's claim for the Government's alleged breach of contract (Counts I-VIII) and then its claim for wrongful termination for default (Counts IX and X).

### A.    Breach of Contract

Edge alleges that the Government breached the contract by refusing to provide equitable adjustments in costs and time for performance for eight separate items.  For three items, the

5

relocation of the well (Count I), an additional catch basin and six-inch pipe (Count II), and insulation of a pipe (Count IV), the Government asserts that Edge failed to justify that it incurred increased costs and that it is entitled to additional days, and therefore, the contracting officer properly denied Edge's claims. Def.'s Mot. 14-16, 16-18, 18-20. The Government avers that the catch basins with a ten-inch pipe (Count III) and the borrow pit (Count V) were in the scope of the contract, and that, therefore, no equitable adjustment was warranted. Def.'s Mot. 18, 20-22. Edge also claims breach of contract because the Government refused to issue change orders and denied its claims for project acceleration (Count VI) and lost productivity (Counts VII and VIII), all related to unseasonable weather conditions. Pl.'s Second Am. Compl. ¶¶ 38, 43, 49. The Government contends that Edge did not experience unusually severe weather, above and beyond what was accounted for by the 63-day extension Edge received, and even if it had, Edge would not be entitled to compensation for lost productivity. Def.'s Reply 15.

The Court finds that the parties' arguments raise three legal issues: (1) whether Edge has provided a reasonable basis for equitable adjustments (Count I, II, and IV); (2) whether the alleged additional work was within the scope of the contract (Counts III and V); and (3) whether Edge is entitled to compensation for unusually severe weather (Counts VI, VII and VIII).

## 1.    Reasonable Basis for Equitable Adjustments (Counts I, II, and IV)

Contract changes and equitable adjustments are governed by FAR 52.243-4 ("Changes") (2007) which permits the government to make changes to the general scope of the contract via oral or written change orders, and gives the contractor the right to an equitable adjustment in costs and time required for performance. FAR 52.243-4 (a) - (d). For any changes pursuant to FAR 52.243-4, the contractor bears the burden of establishing its costs to justify an equitable adjustment. *Daly Construction, Inc. v. Garrett*, 5 F.3d 520, 522 (Fed. Cir. 1993). An actual cost approach, as distinguished from a total cost approach, is preferred. *Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180, 351 F.2d 956, 964-65 (1965). Under the total cost approach, the contractor simply provides evidence of the total cost of completing the contract and compares that to the pre-bid estimates to compute damages without showing an "approximate extent" to which additional costs were attributable to the actions by the government. *Id.* Instead, to establish actual costs, a contractor should provide an approximate allocation of the time and costs associated with the change orders, separate from costs that would have been incurred as part of the contract. *See id.* at 966. The contractor "need not prove his damages with absolute certainty or mathematical exactitude. It is sufficient if he furnishes the court with a reasonable basis for computation, even though the result is only approximate." *Id.* at 968 (citations omitted); *see also Daly Constr.,* 5 F.3d at 522 (affirming Board's denial of compensation because plaintiff failed to establish some "reasonable method for computing the requested compensation").

The Court finds that genuine issues of material fact remain as to whether Edge has provided a reasonable basis for equitable adjustments for Counts I, II and IV, precluding summary judgment.

### a.     Relocation of the Well (Count I)

The parties agree that the relocation of a well was not within the scope of the contract for the construction of the cemetery and therefore that Edge or its subcontractor (FEI) was required to perform additional work consistent with the Government's change order.  *See* Def.'s Mot. 14; Pl.'s Resp. 13.  The Government granted an equitable adjustment, but Edge argues that it is entitled to a higher amount.  *See* Def.'s Mot. 14.

On February 14, 2005, Def.'s App. 238, the Government was directed by Oakland County to relocate "the well for domestic water supply . . . to a minimum of 800 feet from the fuel tanks," compared to the 130 feet in the Government's original plans, Pl.'s Resp. 13.  Edge performed the work associated with the relocation of the well "approximately" between May 13, 2005 and May 18, 2005, and between July 15, 2005 and July 30, 2005.  *Id.*  The Government issued the change order on July 11, 2005 and compensated Edge $20,184.75 for the additional work for the relocation of the well as determined by the Government's architect/engineer.  *See* Def.'s App. 230, 236-38.  Edge subsequently requested $98,252.35 for costs and fees and three additional days for completion of the work and overall project. Def.'s App. 142-43.

The Government argues that Edge failed to provide actual cost data to substantiate additional compensation.  Def.'s Mot. 14.  According to the Government, Edge failed to provide time sheets, material receipts, equipment invoices, and material specifications so that the Government could determine actual costs and assess whether Edge was claiming the total costs for the installation of the well, or only the incremental costs associated with the relocation of the well.  Def.'s Reply. 4   As a result, "the contracting officer compensated Edge for the amount that the VA's architect/engineer estimated for this work" and denied Edge's claim for a higher amount.  Def.'s Mot. 14.

Edge contends that it provided the Government with a contract impact summary of the "additional labor, equipment and materials attributable to the well relocation." Pl.'s Resp. 14; Stapleton Aff. Ex. I.  Edge explained that the total cost impact was based on FEI's daily reports for the days that the subcontractor worked on the relocation of the well.  Pl.'s Resp. 14.

Under the *Wunderlich* standard, the contractor need only provide a reasonable approximate computation of the damages and demonstrate, with reasonable certainty, that those damages arose from changes ordered or directed by the Government.  *See Wunderlich*, 351 F.2d at 968-69.  Considering the parties' arguments and the record, genuine issues of material fact remain as to whether Edge's claimed damages were a reasonable approximation of the actual cost of the relocation of the well.  Therefore, summary judgment in favor of the Government for the relocation of the well is not appropriate.

### b.     Additional Catch Basin and Six-inch Storm Pipe (Count II)

As with the relocation of the well, the parties agree that the additional catch basin and six-inch storm pipe constituted work outside the scope of the contract.  *See* Def.'s Mot. 16-17; Pl.'s Resp. 15.  Again, the issue is whether Edge is entitled to a higher equitable adjustment than the amount granted by the Government.  *See* Def.'s Mot. 16-18.

The Government issued a change order on July 11, 2005 and paid Edge $4,230.00 for this work based on the Government's estimate.  Def.'s Mot. 17; Def.'s App. 162-63.  Edge subsequently requested $22,386.28 for costs and fees and one additional day for performance.  Def.'s Mot. 17; Def.'s App. 155-161; Pl.'s Second Am. Compl. ¶ 16; Pl.'s Resp. 16.

The Government argues that Edge failed to provide actual cost data—payroll records, purchase orders, receipts or invoices—to substantiate additional costs.  Def.'s Mot. 17; Def.'s Reply 6-7.  In addition, Edge did not provide "an explanation of exactly what work was accomplished on each day by each individual."  Def.'s Reply 6-7.

Edge argues that it provided the Contracting Officer a "Contract Impact Summary of the additional labor, equipment and materials attributable to the additional catch basin and PVC pipe."  Pl.'s Resp. 15; Stapleton Aff. Ex. O.  Edge explained that the cost estimates on the summary reports were derived from "the daily reports on the days that work was performed on the additional catch basin and PVC pipe."  Pl.'s Resp. 16.  In further support of its argument that it provided actual cost data, Edge emphasizes that the additional material was provided by the subcontractor (priced at prevailing prices), and that "the individual laborers and equipment [on the daily reports] are specifically identified in the quotations by name and by type."  Pl.'s Resp. 16.

The Government, however, in its reply brief, argues that "simply show[ing] the hours worked by five individuals on two days . . . and claim[ing] an amount of money for all of the hours worked by each of those individuals on those days," is not sufficient to substantiate actual costs.  Def.'s Reply 7.  Furthermore, according to the Government, the individuals and equipment listed on the daily reports were assigned and used on other tasks "for a significant portion of the hours being claimed."  Def.'s Reply 7-8.  The Government also noted a discrepancy between the type of bulldozer equipment used on a particular day (according to the daily report) and the type of equipment for which Edge based its claim for equipment losses.  Def.'s Reply 8.

Although the Government's arguments concerning discrepancies in Edge's reports may have merit, these are factual issues that cannot be resolved on summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (when considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial.").  The Court finds that there are genuine issues of material fact as to the actual costs incurred by Edge and whether Edge has provided a "basis for reasonable approximation of such increased costs."  *See Wunderlich*, 351 F.2d at 969.  Thus, summary judgment is not appropriate for Edge's claim for damages related to the additional catch basin and six-inch pipe.

### c.    Insulation on 100 Feet of Pipe (Count IV)

With regard to the insulation of 100 feet of pipe (Count IV), the Government did not issue a change order for this work.  The Government initially argued in its motion that the need for the insulation of the pipe stemmed from Edge's own actions and decision.  *See* Def.'s Mot.

19.  Edge contends that the insulation of the pipe was not in the plans and that the Government directed Edge to perform this work; therefore, Edge is entitled to an equitable adjustment.  *See* Pl.'s Resp. 17-19.  The Government, however, in its reply brief, does not address the issue of whether the insulation of the pipe was in the plans nor does it deny that it directed the insulation of the pipe.  *See generally* Def.'s Reply 8-10.  Thus, the Court concludes that, for purposes of this summary judgment order, the Government concedes that it ordered the pipe insulation, and that the Government's order is a change pursuant to FAR 52.243-4.  The only remaining issue, then, is whether Edge provided a reasonable approximation for the additional costs and time for the pipe insulation.  *See* Def.'s Reply 8-10.

Similar to its arguments concerning Counts I and II, the Government contends that Edge "cannot demonstrate that it incurred increased costs as a result of the insulation of the pipe." Def.'s Reply 9.  The Government cites Edge's failure to provide time sheets, receipts and a "job cost ledger or a copy of the company books showing the actual costs incurred on the project." *Id.*  Edge's argument is consistent with its prior arguments in that it contends that it provided a contract impact summary based on daily cost reports showing the labor, equipment, and materials for those days in which FEI performed the installation of the pipe insulation.  *See* Pl.'s Resp. 18.

The Court concludes for the insulation of the pipe (Count IV), as it did for Count I and Count II, that considering the parties' arguments and the record, genuine issues of material fact remain as to whether Edge's claimed damages were a reasonable approximation of the actual cost of the installation of the pipe insulation.  Therefore, summary judgment in favor of the Government for the pipe insulation is not appropriate.

## 2.    Scope of Contract Issues (Counts III and V)

In general, the issue with regard to (1) the two additional catch basins and a ten-inch pipe (Count III) and (2) the borrow pit operations (Count V), is whether the work was within the scope of the contract.  Whether work is within the scope of the contract is primarily a matter of contract interpretation, and thus a question of law for the court to decide.  *See H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998) ("Determining whether a contract contained indications of a particular site condition 'is a matter of contract interpretation and thus presents a question of law.'")(quoting *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984)).  The Court agrees with the Government that the alleged additional work in Counts III and V was within the scope of the contract and that summary judgment on these counts in favor of the Government is warranted.

### a.    Additional Catch Basins and Ten-inch Storm Pipe (Count III)

Edge submitted a claim to the contracting officer on September 20, 2008 for "two additional catch basins and a ten-inch storm pipe, seeking $16,289 and one additional day of contract time."  Def.'s Mot. 18.  On December 12, 2008, the Contracting Officer denied Edge's claim because the two additional basins and piping were identified as part of a solicitation amendment, dated July 13, 2004, and thereby incorporated into the contract awarded on September 1, 2004.  *Id.*; Def.'s App. 230-34; see also Def.'s App. 178-79.

9

Edge did not respond in its brief to the Government's assertion that the work related to the two additional catch basins and ten-inch pipe was included in the scope of the contract. Therefore, the Court finds that Edge has conceded that the work associated with these items is within the scope of the contract. Edge has failed to raise a genuine issue of material fact and summary judgment in favor of the Government for the catch basins and ten-inch pipe is warranted.

### b.    Borrow Pit (Count V)

Edge submitted a claim to the Contracting Officer, dated September 20, 2008, seeking an equitable adjustment of $446,494.30 for costs and an additional 45 project days for conducting borrow pit operations.[1]  Def.'s Mot. 20; Def.'s App. 188-92.  The Government denied this claim on December 12, 2008 on the ground that the contract specifications provided notice to the Contractor that it would be responsible for any fill and related borrow operations.  Def.'s Mot. 20-22; Def.'s App. 230-34.

In addition to arguing that this work was within the scope of the contract—a question of law—Edge also contends that it relied on certain representations made by the Government outside the contract documents that led Edge to conclude that it would not be necessary to include borrow pit operations in its bid.  *See* Pl.'s Resp. 7.  The Court concludes that the possibility of borrow pit operations was clearly part of the contract specifications, Edge did not rely on representations by the Government in preparing its bid, and a reasonable contractor would not have excluded the borrow pit from its bid.

### (1)    Interpretation of the Scope of the Contract

The Government argues that the earthwork specifications of the contract (section 02200 Part 3.1) provided that borrow operations, including the cost of transporting any fill required, and the fill itself, may be required.  *See* Def.'s Mot. 20-22.  Accordingly, bidders should have included costs in their bids.  *See id.* at 20.  Edge merely alleges, without further discussion, that "the plans and specifications gave no indication that a borrow pit would be necessary," Pl.'s Resp. 3, and that neither Edge nor FEI could have anticipated the need for a borrow pit.  *Id.* at 6.

Where the parties disagree as to the scope of the contract, the court must ascertain the scope based upon the meaning of the terms of the contract.  Under rules of contract interpretation, if the language is unambiguous, the court must apply the plain meaning of the contract.  *Ace Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007).  In addition, the "'proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents.'"  *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1350 (Fed. Cir. 2008) (quoting *H.B. Mac v. United States*, 153, F.3d 1338, 1345 (Fed. Cir. 1998)).

---

[1] Borrow, as defined in the earthwork specifications of the contract, is "satisfactory soil imported from off-site to use as fill or backfill."  Def.'s App. 194, Section 02200 ("Earthwork"), Part 1.2 (N),

The Court finds the contract unambiguous and that a reasonable and prudent contractor would have recognized the possibility of a borrow pit.  The earthwork specifications require that the contractor provide for "all equipment, materials, labor, tools, and techniques" for filling and backfilling "with native or imported materials."  Def.'s App. 193, Part 1.1(3).  With respect to site preparation, based on the contour lines and grades established, the contract specified that the "Contractor will be responsible for any additional . . . fill required to ensure that the site is graded to conform to elevations indicated on plans."  Def.'s App. 199, Part 3.1 (E).  The contract also provided that borrow, which is imported soil required for filling or backfilling, Def.'s App. 194, Part 1.2 (N), "shall be supplied at no additional cost to the Government."  Def.'s App. 202, Part 3.4 (A).

Based on the language of the Contract, contractors are responsible for all labor and materials for filling and backfilling, including any borrow pit operations that may be required. Because the borrow pit was included in the scope of the contract, Edge is not entitled to an equitable adjustment, and summary judgment in favor of the Government is warranted.

### (2)      Reliance on  Government's Representations

Edge, instead of focusing on the language of the contract, emphasizes that its claim for additional costs and days associated with borrow pit operations is based on its reliance on representations by the Government.  *See* Pl.'s Resp. 7.  Edge claims that in determining the scope and costs of its bid, it and its subcontractor relied on statements by the Government at a "pre-bid" meeting in September of 2004.  *Id.*  According to Edge, the Government representative "stated that the site was balanced, meaning that there would be no need to import or export soil, other than topsoil."  *Id.*

The Government explains that the meeting referred to by Edge as a "pre-bid meeting" was held on September 21, 2004, which was after the bid submission date.  *See* Def.'s Reply 11. The meeting was not a "pre-bid" meeting, but rather a "pre-construction" conference that occurred "two months after Edge submitted its bid on July 20, 2004, and three weeks after contract award on September 1, 2004."  Def.'s Reply 11.  In addition, the meeting occurred after FEI submitted its bid to Edge on September 20, 2004.  *See* Def.'s Reply 11-12; Erdman Aff. Ex. A.  Based on the record, Edge cannot dispute that the meeting, upon which Edge claims to have relied in preparing its bid, occurred after it submitted its bid.  Thus, Edge's argument that it and FEI relied on representations made by the Government in submitting their respective bids has no merit.

### 3.      Claims Based on Unusually Severe Weather Conditions (Counts VI, VII and VIII)

Edge seeks relief for (1) "additional costs associated with acceleration due to unseasonable weather" (Count VI); (2) "costs associated with lost productivity due to unseasonable weather conditions" (Count VII); and (3) "costs associated with lost productivity resulting from rain, freezing conditions and mud" (Count VIII).  Pl.'s Second Am. Compl. ¶¶ 34-48.  Edge claims that it experienced unusually severe weather during the course of the project, contributing to delays in its performance.  *See* Pl.'s Resp. 20-22.  On April 19, 2005, the

Government granted a 63-day extension for the period September 21, 2004 through May 1, 2005, but at no cost to the Government.  Def.'s Mot. 7; Def.'s App. 59-61.  On June 30, 2005, Edge requested that the Contracting Officer issue a change order for $623,795.00 for the additional costs associated with the severe weather it experienced.  Def.'s App. 81-84.  In September 2008, [2] Edge ultimately filed its claims with the Contacting Officer for additional extensions of time and costs for the severe weather conditions.  When the Government refused to issue change orders and denied Edge's claims for additional days and costs for unusually severe weather, Edge filed suit in this Court for breach of contract.  Pl.'s Second Am. Compl. ¶¶ 34-48.

The Government argues that Edge cannot demonstrate from the data it provided, either with the claim it submitted to the Contracting Officer or in response to the Government's motion for summary judgment, that it experienced unusually severe weather, except for the months of December 2004 and January 2005.  *See* Def.'s Mot. 22; Def.'s Reply 15.  For that time period, the Government contends that it granted Edge an extension of time for weather delays.[3]  Def.'s Reply 15.  Edge disputes the Government's conclusion that Edge did not experience additional delays for unusually severe weather conditions.  Pl.'s Resp. 22.  In addition, for weather-related delays, the Government argues that it is not obligated to provide compensation for lost productivity or other damages.  *See* Def.'s Mot. 22-23; Def.'s Reply 15.

### a.    Compensable Delays:  Lost Productivity (Counts VII and VIII)

The Court does not have to decide whether there was an excusable delay due to unusually severe weather in order to address what seems to be the Government's contention that, as a matter of law, excusable delays for unusually severe weather are not compensable in money.  *See* Def.'s Mot. 23.

Federal regulations provide for extensions of *time* for excusable delays (e.g., unusually severe weather), but do not provide for equitable adjustments for such delays.  *See generally* FAR 52.249-10; *see also Fraser Constr. Co. v. United States,* 57 Fed. Cl. 56, 59 n.2 (2003).  Equitable adjustments are governed and limited by the changes clause, whereby a contractor is entitled to an equitable adjustment only for those changes ordered or directed by the Contracting Officer pursuant to the changes clause.[4]  *See* FAR 52.243-4(a)-(d).  As a result, contractors are not entitled to compensation for excusable delays not caused by the government.  *See, e.g.*, *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1348 (2000) (requiring that the contractor "demonstrate[] a government-imposed delay, *i.e.*, a compensable delay" to recover damages);  *cf. Luria Bros. & Co., Inc. v. United States*, 177 Ct. Cl. 676, 369 F.2d 701, 714 (1966) (recognizing that the contractor may recover costs when loss of productivity results from the government's actions).  Thus, because the delays Edge experienced from unusually severe weather conditions were not caused by the Government, Edge is not entitled to an equitable adjustment for lost productivity

---

[2] *See supra* section I, discussing the timeline of Edge's complaints filed with this Court and its claims filed with the Contracting Officer.

[3] The Government granted a 63-day extension for weather-related delays for the period from September 21, 2004 until May 1, 2005.  Def.'s Reply 15.

[4] Changes pursuant to FAR 52.243-4 include direction by the Contracting Officer for project acceleration.  FAR 52.243-4(a)(4).  Project acceleration is discussed *infra* section III.A.3(c).

due to severe conditions.  Since Edge does not have a valid claim for lost productivity damages due to unusually severe weather, summary judgment in favor of the Government is appropriate.

### b.      Extension of Time for Unusually Severe Weather

In addition to lost productivity damages, Edge requested an increase in time for project completion of 237 days due to severe weather conditions.  Pl.'s Resp. 25.  The Contracting Officer denied Edge's request because the data presented by Edge "indicates that it experienced completely normal and average weather conditions for the project location."  Def. Mot. 23-24. Edge vigorously argues otherwise and has provided sufficient evidence to at least establish a factual dispute for resolution at trial.

In determining whether a contractor is entitled to an extension of time for weather-related delays, the contractor must provide evidence of unusually severe conditions.  *Broome Constr. Inc. v. United States*, 203 Ct. Cl. 521, 492 F.2d 829, 835 (1974).  In *Broome Construction*, the court declared that   "[u]nusually severe weather must be construed to mean adverse weather which at the time of year in which it occurred is unusual for the place in which it occurred."  *Id*. Thus, unusually severe weather is determined based on a comparison of the conditions experienced by the contractor and the weather conditions of prior years.  *Cape Ann Granite Co. v. United States*, 100 Ct. Cl. 53, 71-72 (1943).  Unusually severe conditions, however, are "not established simply because weather charts may indicate that on a certain day the precipitation is greater than on some other days in some other year, since variance in weather patterns is to be expected."  *Broome*, 492 F.2d at 835.

The Government argues that "Edge cannot demonstrate that it experienced anything other than typical weather in Flint, Michigan, during its performance of the contract work."  Def.'s Mot. 24.  The Government states that the weather data that Edge provided in its justification for its claim submitted to the contracting officer "shows that the average temperature for Flint Michigan, during September 2004, when the notice to proceed was issued, was 64.2 degrees fahrenheit,"  *Id*.  From annual data of prior years, the Government concludes that "[t]his is similar to other average temperatures" for the same months in the previous four years.  Def. Mot. 24.

Edge contends that a report of the National Oceanic and Atmospheric Administration ("NOAA") shows that the 2004 to 2005 winter was anything but normal.  Pl. Resp. 22-23; Pl.'s Ex. AA.  In addition, the average temperatures are misleading in that they fail to account for the "extreme swings in highs and lows for each month," and therefore, do not reflect the adverse effect on the work conditions.  *See* Pl. Resp. 23.  Edge asserts that it "has provided information that establishes not only that unusually severe weather conditions were encountered, but [that it] has also maintained diligent records regarding the days and extent of the severe weather."  Pl. Resp. 21-22.

The Government notes in its reply brief that Edge, in its response, submitted for the first time "official weather data showing that it experienced an extreme fluctuation of temperatures during December 2004 and January 2005."  Def. Reply 14.  The Government reiterates that on

May 31, 2005, the Contracting Officer granted a 63-day extension for weather related delays, and thus, Edge is not entitled to additional days.  Def. Reply 15.

The weather data is sufficiently equivocal such that the Court cannot resolve on summary judgment whether Edge is entitled to an extension of project time for weather-related delays.

### c.    Compensable Delays:  Project Acceleration (Count VI)

Edge also alleges that it is entitled to compensation for "additional costs associated with acceleration due to unseasonable weather" (Count VI).  Pl.'s Second Am. Compl. ¶35. Acceleration—actual or constructive—is a basis upon which a contractor might be able to recover damages for unusually extreme weather.  *See* FAR 52.243-4(a)(4); *Fraser Constr. v. United States*, 384 F.3d 1354, 1360-61 (Fed. Cir. 2005).  For constructive acceleration, the contractor must prove an excusable delay, that an extension was requested and denied, the government insisted on completion within a timeframe that did not allow for the extension, and as a result, the contractor incurred additional costs.  *Id.* at 1361.

The Government appears to respond to Edge's claim for damages for project acceleration only as part of its argument under the heading of "Loss of Production Due to Unseasonable Weather."  *See* Def.'s Mot. 22-24.  Therefore, the Court is warranted in concluding that the Government does not dispute that unseasonable weather, if proved, can be a legitimate basis for sustaining a claim founded on constructive acceleration.

As just discussed, genuine issues of material fact remain as to whether Edge was entitled to additional days for unusually severe weather conditions.  Because this disputed issue is a factor in determining project acceleration damages (i.e., whether delays were excusable), summary judgment in favor of the Government is inappropriate on Edge's claim for acceleration due to unseasonable weather.

### B.    Wrongful Termination for Default

The Government terminated the contract with Edge for default on September 9, 2005, pursuant to FAR 52.249-10, based on Edge's performance on the contract and the Government's lack of confidence that Edge would complete the remainder of the project by the completion date.  Def.'s Mot. 11; Def.'s App. 111-20.  Edge alleges that the Government's termination for default was improper and requests that the Court declare that the termination be considered one for convenience.  Pl.'s Second Am. Compl. ¶ 57.  Edge also seeks damages of $6,938,286.00 related to the wrongful termination for amounts expended by its surety.  *Id.* at ¶¶ 58-61.  The Government avers, based on the totality of the circumstances, that when the Contracting Officer terminated the contract for default, the agency "reasonably believed that Edge could not perform the remaining contract work according to the contract plans and specifications within the contract completion date."  Def.'s Mot. 32.  The Court finds that a genuine issue of material fact remains as to the Government's termination for default, precluding summary judgment.

The Contract incorporated FAR 52.249-10, the default clause, which gives the Government the right to terminate a contract for default if the contractor "refuses or fails to

prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in [the] contract including any extension, or fails to complete the work within this time."   FAR 52.249-10(a).  The decision to terminate for default is within the discretion of the contracting officer's business judgment.  *Engineered Maint. Servs., Inc. v. United States*, 55 Fed. Cl. 637, 641 (2003) (citing *Florida v. United States*, 33 Fed. Cl. 188, 196 (1995).  The contracting officer, however, must not make the decision to terminate for default in an "arbitrary and capricious" manner.  *Darwin Constr.Co.  v. United States*, 811 F.2d 593, 596 (Fed. Cir. 1987).  The government bears the burden of proof as to whether the termination for default was justified.  *Libson Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987).

The government, however, may not terminate a contractor's right to proceed under the default clause if "[t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor."  FAR 52.249-10(b)(1). Unforeseeable causes include "unusually severe weather."  FAR 52.249-10(b)(1)(x).  The contractor must notify the contracting officer of the causes of the delay, and the contracting officer will then determine if an extension of time is warranted.  FAR 52.249-10(b)(2).  Although the contracting officer's decision as to an extension of time is "final and conclusive on the parties, . . . [it is] subject to appeal under the Disputes clause."  *Id.*

Whether a default termination was proper is a question of law based on several underlying factual inquiries.  *McDonnell Douglas Corp.  v. United States*, 567 F.3d 1340, 1347, 1348 (Fed. Cir. 2009) ("A default termination, even though ultimately a question of law, is a fact-sensitive inquiry.").  For the government to prove that a termination for default for failure to make progress was justified, it must demonstrate that the contracting officer reasonably believed that "'there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance.'"  *Id.* at 1346 *(*quoting *McDonnell Douglas Corp.  v. United States*, 323 F.3d 1006, 1017 (Fed. Cir. 2003));  *Danzig v. AEC Corp.*, 224 F.3d 1333, 1336-37 (Fed. Cir. 2007).  Thus, the factual inquiries include, inter alia, the actual performance required by the contract, the contract completion date, the work required to complete the contract, and the amount of time to complete such work.  *See McDonnell Douglas*, 323 F.3d at 1016-17.  If there is a genuine issue of dispute about these factual inquiries, as to affect the outcome of the court's determination of whether the government was justified in its default termination, then summary judgment would not be appropriate.

Additionally, a court's review of a termination for default must be based on the totality of the circumstances and "tangible, direct evidence reflecting the impairment of timely completion."  *Id.* at 1016.  The Government presents compelling arguments on several fronts in an effort to convince the Court that the Contracting Officer had a reasonable belief that there was no reasonable likelihood that Edge could perform the entire contract within the time for completion of the contract.  *See* Def.'s Mot. 27-31.  The completion date of the contract, however, could have been affected by the additional days that Edge has claimed for unusually severe weather, if Edge is entitled to those days.  As the Court has already determined, there remains a genuine dispute about the existence of unusually severe weather.  Furthermore, the Government did not address Edge's statement that, although the Government granted Edge a 63-day extension of the ETA, it did not extend the completion date of the contract accordingly. Def.'s Mot. 30; Pl.'s Resp. 27 n.4.  In considering its decision to terminate the contract for

default, the Government assessed whether there was any reasonable likelihood as to whether Edge could complete the remaining work by the original overall completion date.  Def.'s Mot. 28.  Edge contests the completion date because it was entitled to "an extension of time for completion of the ETA and the overall Project."  Pl.'s Resp. 3.

The Court must first resolve the factual dispute as to the amount of time remaining for performance before it can determine whether the Contracting Officer had a reasonable belief that there was no reasonable likelihood of completion within the time remaining.  *See McDonnell Douglas*, 323 F.3d at 1017.  Thus, a genuine issue of material fact remains, and the Government is not entitled to summary judgment on Edge's claim that the termination for default was improper.

## IV.   CONCLUSION

The Government's motion for summary judgment on Edge's ten counts is **GRANTED** in part and **DENIED** in part:

Counts I, II, and IV (breach of contract for undisputed additional work) – summary judgment is **DENIED** because genuine issues of material fact remain as to the actual costs for additional work performed under the contract.

Counts III and V (breach of contract for alleged additional work) – summary judgment is **GRANTED** because the alleged additional work was within the scope of the contract.

Counts VI (breach of contract for project acceleration for unseasonable weather) – Summary judgment is **DENIED** because genuine issue of material fact as to "unseasonable weather," and the Government failed to establish that it was entitled to judgment as a matter of law.

Counts VII and VIII (breach of contract for lost productivity resulting from unseasonable weather) – summary judgment is **GRANTED** because Edge is not entitled to equitable adjustments for lost productivity for unusually severe weather.

Counts IX and X (wrongful termination for default) – summary judgment **DENIED** because a genuine issue of material fact remains as to the completion date of the project for purposes of assessing whether the Government was justified in its default termination.

The parties shall file a Joint Status Report on or before December 3, 2010, addressing how they propose to proceed and a schedule for such proceedings.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge